KLEES, Judge.
This court has granted certiorari to review the following issues:
1) Did the trial court err in finding that the State withheld evidence which was favorable to the defendant and material to either guilt or punishment?
2) Did the States actions or omissions, indicate an intent to provoke or goad the defendant into requesting a mistrial.
For the following reasons we conclude that the trial court’s rulings be reversed and remand this matter for further proceedings.
The defendant, John B. Williams, was charged by indictment on April 4, 1985, with two counts of bribery of sports participants, violations of R.S. 14:118.1[1] and *985 three counts of conspiracy to commit bribery of sports participants, violations of R.S. 14:26 (118.1).[2] Williams pled not guilty to all counts at his arraignment on April 15, 1985.
One month later, on May 15, 1985, defense counsel filed numerous motions, including a “Motion for Production of Evidence Favorable to Defendant and for Disclosure of Impeaching Evidence” and a “Motion for Bill of Particulars, Discovery and Inspection and Production”. In the former motion, the defense requested production of all impeaching evidence relative to State witnesses including prior inconsistent statements (Para. 1). The latter motion sought production of “tapes, recordings, tangible objects ..., which are favorable to the defendant and which are material and relevant to the issue of guilt or punishment or intended for use by the State as evidence at trial...” (Para. 1, 26). Paragraph 29 requested that the State supply the defendant with copies of any audio or videotaped statements from State witnesses. By paragraph 34, the defendant sought any exculpatory evidence. On July 10, the defendant filed a “Motion to Produce Police Reports”.
On June 10th, the State answered the defendant’s requests for discovery and the motion for bill of particulars. The State responded that it possessed no exculpatory material and no prior inconsistent statements of State witnesses. The answers were amended and supplemented numerous times. In its supplemental answers filed July 23rd, the State listed eighteen witnesses, including Jon Johnson and Clyde Eads, from whom recorded statements were obtained, and stated that they were available for in camera inspection. On July 17th, the State answered that it had no “police incident report”.
On July 17th, an evidentiary hearing was held and Sergeant Frank Ruiz testified that he had prepared a police report. The trial judge ordered production of this document for an in camera inspection. The court found that the first eleven pages of the report were discoverable under State v. Shropshire, 471 So.2d 707 (La.1985). Included in the portion of this report read by the judge but not turned over to the defense was a reference to the taped statement of John Johnson taken by Assistant District Attorney Eric Dubelier. Also at the hearing, the trial judge ordered the State to disclose whether it possessed any prior inconsistent statements and stated that he would make an in camera inspection of the contents of this material and determine whether it was discoverable under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The judge warned: “I’m going to repeat myself again, and I’m going to do it throughout the entire pleadings. If the State answers they don’t have Brady material and Brady material comes out in the record at trial, you’re entitled to a mistrial”.
On July 23, 1985, the State produced for an in camera inspection all grand jury transcripts and witnesses’ statements. The State did not produce the tape recorded statements of Clyde Eads and Jon Johnson and the transcript of Jon Johnson’s statement. After conducting an in camera review, the trial judge found no Brady material. At a hearing on August 7th, the *986 trial judge once again warned: “... I am saying for the third time, if Brady comes out in the trial of this case that the Defense has not been privy to, I will grant a mistrial in this case.” (The transcript in the record is erroneously dated August 5, 1985).
The trial commenced on August 12, 1985. On the next day, during his testimony, Jon Johnson made a reference to his previous tape recorded statement. The defense then made a motion for mistrial based on the State’s failure to disclose Brady material. After the jury was excused, and after argument of counsel, the trial judge declared a mistrial. Following a lengthy discussion in the judge’s chambers, all parties returned to the courtroom where the trial judge asked the defendant whether or not he objected to the mistrial. When the defendant remained silent, the judge vacated his order for a mistrial. The trial judge stated that he would review all witnesses’ statements for Brady material and then recessed the trial to the following day.
During the evening of August 13th, defense counsel learned through a news reporter that the prosecution possessed pictures of Gary Kranz and others purporting to show that they possessed substantial quantities of cocaine. On the following morning, the trial judge ordered the State to produce its entire file for review. Later that day, the defense filed a “Motion to Dismiss on the Grounds of Prosecutorial Misconduct.” After hearing argument of counsel, the trial judge stated that he would take the motion under advise-ment pending review of the State’s file.
On August 15th, the judge stated he was unsure whether Brady material existed in the State’s file. Later that same day, the defendant filed a new motion for mistrial on the ground that the State’s failure to disclose Brady material was conduct intended by the State to goad or provoke the defendant into moving for a mistrial. The trial court granted this motion after hearing argument of counsel. The court then set a tentative trial date of September 9, 1985, at 9:00 a.m. Although the court granted the State until August 22, 1985 to apply for supervisory writs, the State opted to file a “Motion to Clarify and Amend the Order Granting Defendant’s Motion for Mistrial.” On August 23,1985, the defendant filed an answer to the State’s motion and filed a “Motion to Quash the Indictment”.
On August 28, 1985, the trial court denied the State’s Motion to Clarify and Amend and granted the defendant’s Motion to Quash. The trial judge issued a twenty-four page written ruling on these motions. It is from these August 28th decisions that the State files the present application.
The trial court granted the defendant’s motion to .quash concluding “... as a finding of fact that the intentional prosecutorial misconduct amounting to overreaching intended to goad or provoke the defendant into moving for a mistrial was done with the intent on the part of the prosecutor to subvert the protections i afforded by the Double Jeopardy clauses of the Louisiana Constitution and the United States Constitution.” The court’s ruling is based on Oregon v. Kennedy, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982), wherein the United States Supreme Court held: “Only where the governmental conduct in question is intended to ‘goad’ the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.” In the present case, the trial judge found that the State’s non-disclosure of alleged Brady material was sufficient to evidence the State’s intent to provoke the defendant into moving for a mistrial.
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that “the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment.” The holding in Brady requires disclosure only of evidence that is both favorable to the accused and material to either guilt or punishment. In the present case, the prosecu *987 tion failed to disclose evidence that the defense might have used to impeach the State’s witnesses’ credibility by showing bias, prior inconsistent statements or bad character. Impeachment evidence is considered evidence favorable to the defendant and falls within the Brady rule. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).
The trial judge found that the State withheld three pieces of evidence to which the defendant was entitled: (1) a police report prepared by Sergeant Frank Ruiz; (2) a taped statement of Jon Johnson taken by Assistant District Attorney Eric Dubelier; and (3) photographs of Gary Kranz.
The initial inquiry must be whether the defendant was entitled to this evidence. If he was not, the State was under no obli-gation to provide it to the defense. If this evidence is found to be discoverable, the question then becomes whether the facts and circumstances of the prosecutors’ actions or omissions indicate an intent on their part to force the defendant into requesting a mistrial.

The Police Report

C.Cr.P. art. 723 specifically provides that the Louisiana criminal rules of discovery do not authorize “the discovery or inspection of reports, memoranda or other internal state documents made by the district attorney or by agents of the state in connection, with the investigation or prosecution of the case; or of statements made by witnesses or prospective witnesses, other than the defendant, to the district attorney, or to agents of the state.”
However, in 1984, the Louisiana Legislature passed Act No. 945 which amended R.S. 44:3(A)(4) to provide that the initial report of the police officer is a public record. In State v. Shropshire, 471 So.2d 707 (La.1985), the Louisiana Supreme Court interpreted this amendment and stated that the prior jurisprudence which held that police reports were confidential and not subject to disclosure were legislatively overruled by this new act. The court held that the initial report or the incident report of the officer or officers investigating the complaint must be produced for the defendant’s examination.[3]
Thus, in the present case, the de-. fendant was entitled to the police report; however, on July 17th, the State answered that none existed (R. 159). Assistant District Attorney Bruce Whittaker stated to the court, “... the State is not playing with semantics. It’s well aware of what Shropshire is all about. There is no police report prepared. There’s never been a police report in this case, incident, initial, whatever you want to call it.” Yet minutes later, Sergeant Frank Ruiz testified that he prepared a police report which, at that time, was locked in his office. He then retrieved the report and after an in camera inspection by the trial judge, the defendant was given the. first eleven pages of the report. Thus, the defendant was provided with the, police report twenty-six days before the trial began.
The trial court partially bases its conclusion that the State intentionally provoked the defendant into requesting a mistrial on the State’s failure to disclose the existence of the police report. In other words, the trial court believed that the State’s strategy to force a mistrial was formulated and employed on or before July 17th, when the State denied that a police record had been prepared. From the facts and circumstances of the State’s actions this court can find no foundations upon which to base this conclusion. Unless one assumes that the State intended to cause a mistrial twenty-six days before trial began, the trial court’s reasoning is unsupported by the record. More plausible explanations, as the State has argued, are that either Assistant District Attorney Bruce Whittaker was unaware that a police report existed, or that the State misconstrued the “face sheets” as not constituting the police report. Even assuming that the State was acting in bad *988 faith and deliberately withheld the police report, it does not appear that the State’s actions were a premeditated attempt to cause a mistrial at some future time during the trial when the prosecution was proceeding poorly.

Jon Johnson’s Statement

On March 26, 1985, at about 5:35 P.M., Jon Johnson gave a taped statement to Assistant District Attorney Eric Dubelier and Sergeant Frank Ruiz. The statement was recorded on an audio cassette tape and transcribed into a twelve page document. The State did not produce this tape or transcript when ordered to turn over all recorded statements to the trial court.
The trial court found that Jon Johnson’s statement constituted Brady material and should have been produced by the State. In United States v. Bagley, — U.S.-, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the United States Supreme Court defined the term “material” as it relates to Brady material: “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” United States v. Bagley, — U.S. at -, 105 S.Ct. at 3384. See also United States v. McKenzie, 768 F.2d 602, 610 (5th Cir.1985).
In denying the State’s motion to clarify the order granting a mistrial, the trial judge focused on the tenor of Jon Johnson’s voice rather than on the content of the statements. The judge wrote: “The audio tape recording Johnson’s statements ... reveals something else: on that evening, Jon Johnson was a worried man. Johnson was terrified of prosecution for what he knew to be crimes; and sounds willing to tell Assistant District Attorney Dubelier whatever was wanted, regardless of truth ... The sound of anguish, of subordination is unmistakable in Johnson’s voice.” (emphasis in original).
This court has reviewed the audio tape numerous times and finds no evidence of fear or intimidation in Johnson’s voice. Although he sounds nervous, this is a normal emotion considering the custodial environment and his fear of certain criminal prosecution arising from this investigation.
Moreover, a review of the March 26th statement reveals no material inconsistencies when compared with Johnson’s March 28th grand jury testimony and his August 13th trial testimony. Although there are minor variances, the substance of his statement is generally consistent with his testimony before the grand jury and at trial. In United States v. McKenzie, supra, the defendant argued that the prosecutors’ failure to disclose a witness’ taped statement violated the dictates of Brady and denied him a fair trial. On appeal, the Court held that this statement cannot be considered exculpatory material.
The basic facts in that statement are essentially consistent with his testimony at trial. The statement would have been useful only as a source of impeachment material. Brady requires the prosecutor to produce evidence that is useful for impeachment, as well as exculpatory material. United States v. Bagley, — U.S. -, -, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). However, Brady mandates the reversal of a conviction only if the evidence withheld is material. 83 S.Ct. at 1196-97. “The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” Id. [105 S.Ct.] at 3384. Because this statement contains only cumulative impeachment material, it is altogether improbable that its production would have changed the jury’s verdict.
United States v. McKenzie, supra, at 610.
Similarly, in the present case, the March 26th statement does not contain any additional information that would have aided the defendant’s cross-examination of Jon Johnson. At most, the statement provides *989 only minor cumulative impeachment material, and it is unlikely that its production would have changed the outcome of the trial.
Even assuming arguendo that this evidence constitutes Brady material, the State did not “suppress” the existence of the statement. In fact, the State disclosed the existence of the statement on two separate occasions. The State initially stated that it possessed no prior inconsistent statement of State witnesses; however, in a supplemental answer to the defendant’s discovery request, the State answered that it possessed recorded statements from eighteen persons. The first two persons listed in the State’s answer are Clyde Eads and Jon Johnson.[4] The State also provided that these statements were available for an in camera review by the trial judge. Additionally, in the police report prepared by Sergeant Frank Ruiz and reviewed by the trial judge on July 17, 1985, there is a reference to Jon Johnson’s statement.[5]
Of course, the tape itself was not provided to the trial judge when he ordered the State to produce all prior recorded statements of witnesses. The judge on at least three occasions warned that the State’s failure to disclose Brady material would result in a mistrial. However, on August 15,1985, after the trial judge had reviewed the State’s entire file, including Jon Johnson's statement and the photographs of Gary Kranz, he stated:
Those materials that I reviewed all last night
contained what I believe to be materials that may possibly be Brady material. There is no way I, you in your competency as an attorney, or any human can review all that material taken in context with the testimony thus far given and make a determination of yes, absolutely Brady, no positively not Brady material. What I’m saying to you, sir, is that it’s this Court’s intention to turn over to the Defense all of the evidence that is in the possession of the State of Louisiana under Brady v. Maryland. Some may not be Brady, Mr. Green. Some may not be Brady, (emphasis added)
Yet, despite these comments indicating his uncertainty as to whether the evidence was Brady material, which were made on the same day the defendant’s motion was granted, the trial judge writes in his reasons for decision:
The Court concludes that Assistant District Attorney Dubelier, an experienced and technically skilled prosecutor, well aware of the prospective use and value of Johnson’s earlier statement, deliberately and in bad faith, suppressed Johnson’s earlier statements, first denying the statements existed, and then withholding the tape and transcript from the Court when ordering to provide each to the Court for in camera review.
There is no doubt that the State did not turn over the tape of Jon Johnson’s statement when ordered by the trial court. However, the State disclosed the existence of this statement twice. Moreover, it is this court’s finding that this statement does not constitute Brady material under United States v. Bagely, supra, and United States v. McKenzie, supra. The State’s actions, while certainly not to be condoned, do not show an intent to provoke or goad the defense into requesting a mistrial.

Photographs of Gary Kranz

On August 15, 1985, the trial judge learned that the State possessed photographs of Gary Kranz, a State witness, and other persons with quantities of cocaine. These photographs were not produced by the State despite the defendant’s request *990 for materials that may impeach the credibility of State witnesses.
After examining Gary Kranz’s trial testimony, the impeaching values of these photographs is marginal. While Kranz denied at trial being a cocaine dealer or a cocaine addict, he admitted being an occasional user of cocaine. (In fact, he was charged with nine counts of distribution of cocaine.) Also, only one of the photographs actually depicts Gary Kranz with cocaine. However, the defense requested impeaching evidence many weeks before the trial. When the defense requested this evidence, the State must have known that one of the photographs, showing Gary Kranz apparently indulging in cocaine use, would tend to impeach his credibility.
As previously mentioned, the standard for determining whether this evidence is Brady material is whether the outcome of the trial would probably be different had the evidence been produced. Here, these photographs tend to impeach Gary Kranz on a collateral issue: the extent and frequency of his cocaine use. The prosecutor’s failure to respond fully to the Brady request with the photographs of Gary Kranz does not appear to have denied the defendant a fair trial. The impeachment value of this photograph becomes significantly diluted after Kranz’s testimony of his cocaine use and distribution. This evidence is not Brady material under United States v. Bagely, supra.
This court can easily empathize with the trial judge, whose orders were ignored, or even intentionally disregarded, by the State on at least three occasions. His conduct throughout this bitter, hard fought dispute was professional and straightforward. Nonetheless, after a painstaking review of the entire record of this case, we conclude that there is little support for the trial judge’s conclusion that the State employed a strategy to provoke or goad the defendant into seeking a mistrial.
The trial judge relies on the State’s “suppression” of three pieces of evidence in granting the defendant’s motion. As previously discussed, two of these incidents involved evidence which we have found does not constitute Brady material and the failure of the State to produce Sergeant Frank' Ruiz’s police report was cured nearly a month before trial.
Moreover, prosecutorial conduct that could be viewed as harassment or overreaching, even if sufficient to justify a mistrial, does not bar retrial absent an intent on the part of the prosecutor to “subvert the protections afforded by the Double Jeopardy Clause ... Only where the governmental conduct in question is intended to “goad” the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial...”. Oregon v. Kennedy, supra, 456 U.S. at 675-676, 102 S.Ct. at 2089. (emphasis added).
The record in this matter simply does not support the trial court’s conclusion that the State employed a strategy to force a mistrial by intentionally withholding evidence which they knew was Brady material.
For the aforementioned reasons, the trial court’s ruling is hereby reversed and the case remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.

. A. Bribing of sports participants is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any professional or amateur baseball, football, hockey, polo, tennis or basketball player or boxer or any person or player who participates or expects to participate in any professional or amateur game or sport or any contest of skill, speed, strength or endurance of man or beast or any jockey, driver, groom or any person participating or expecting to participate in any horse race, including owners of race tracks and their employees, stewards, trainers, judges, starters or special policemen, or to any owner, manager, coach or trainer of any team or participant in any such game, contest or sport, with the intent to influence him to lose or cause to be lost, or corruptly to affect or influence the result thereof, or to limit his or his team’s or his mount or beast’s margin of victory in any baseball, football, hockey or basketball game, boxing, tennis or polo match or horse race or any professional or amateur sport or game in which such player or participant or jockey or driver is taking part or expects to take part, or has any duty in connection therewith.
The acceptance of, or the offer to accept directly or indirectly anything of apparent present or prospective value under such circumstances by any of the above named persons shall also constitute bribery of sports participants.
*985 Whoever commits the crime of bribery of sports participants is guilty of a felony and shall be punished by a fine of not more than ten thousand dollars and imprisoned for not less than one year nor more than five years, with or without hard labor, or both.
B. The offender under this Section, who states the facts under oath to the district attorney charged with the prosecution of the offense, and who gives evidence tending to convict any other offender under that Section, may in the discretion of such district attorney be granted full immunity from prosecution in respect to the offense reported, except for perjury in giving such testimony.

. Conspiracy is defined in R.S. 14:26:
A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.

. During this past Legislative Session, Senate Concurrent Resolution No. 139 was passed which suspends Act No. 945, effective September 1, 1985, through the sixtieth day after final adjournment of the 1986 Regular Session of the Louisiana Legislature.

. The statements of these two witnesses are recorded on reverse sides of the same audio tape.

. The police report states: "Mr. Dubelier drew up a grant of immunity and a taped statement was taken from Mr. Jon Johnson at about 5:35 p.m. In the taped statement, Mr. Johnson verified what Mr. Eads had said in his statement. (A copy of the taped statement is attached to this report.)” It is unclear from the record whether a copy of this statement was provided to the trial judge as an attachment to the report.